HOMETOWN FINANCIAL, INC., and Continental Financial Holdings, Inc., Plaintiffs,

and

Federal Deposit Insurance Corporation, Plaintiff-intervenor,

v.

The UNITED STATES, Defendant.

No. 90–843C.

United States Court of Federal Claims.

Aug. 23, 2002.

James H. Falk, Jr., Washington, DC, for plaintiff.

Ellis Merritt, Jr., Dallas, TX, for plaintiff-intervenor.

Richard B. Evans, U.S. Department of Justice, Washington, DC, with whom were Robert D. McCallum, Jr., Assistant Attorney General, and Director David M. Cohen, for defendant.

**OPINION**

FIRESTONE, Judge.

This case is one of the cases related to *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). In *Winstar*, the Supreme Court ruled that pas-

sage of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (1989) ("FIRREA") (codified as amended in various sections of 12 § U.S.C.), caused a breach of the contract that the government and Winstar Corp. had entered into in connection with Winstar's takeover of a failing savings and loan. The plaintiffs and plaintiff-intervenor seek to extend *Winstar* to the circumstances of this case. The matter is presently before the court on the parties' cross-motions for partial summary judgment on liability with respect to plaintiffs' and plaintiff-intervenor's breach of contract claims.[1]

Plaintiffs Hometown Financial, Inc. ("HFI") and Continental Financial Holdings, Inc. ("CFHI"), and plaintiff-intervenor the Federal Deposit Insurance Corporation ("FDIC") allege that, as in *Winstar,* passage of FIRREA resulted in a breach of the promises made in their agreement with the government when Hometown Federal Savings and Loan Association ("Old Hometown") was converted into Hometown Federal Savings Bank ("New Hometown"). The government argues that the holding in *Winstar* does not extend to the type of transaction at issue in this case, and thus FIRREA did not result in the breach of any contract between the government, plaintiffs, and plaintiff-intervenor. In the alternative, the government argues that even if FIRREA resulted in a breach of contract, the government has defenses to that breach which preclude a finding of liability against the government.

For the reasons that follow, the court concludes that passage of FIRREA resulted in a breach of the contract entered into regarding the government's approval of plaintiffs' conversion of Old Hometown into New Hometown, and that genuine issues of material fact preclude the court from granting summary judgment to the government on its various defenses to liability. In addition, the court finds that the government's objections to

plaintiffs' damage theories are not yet ripe for review.

## BACKGROUND

### A. Facts

The following facts are not in dispute. Old Hometown was a mutual savings and loan association based in Delphi, Indiana. Old Hometown received its federal charter in 1959, and over the years it opened a number of branches in nearby communities. As a federally-chartered savings and loan association, Old Hometown was subject to oversight and regulation by the Federal Home Loan Bank Board ("Bank Board" or "FHLBB") and the Federal Savings and Loan Insurance Corporation ("FSLIC").

For reasons that are not at issue in this litigation, in the early 1980's, Old Hometown began to suffer substantial losses. The FHLBB took several actions starting in the mid–1980's to deal with these losses, however Old Hometown was not able to correct its financial problems and the FHLBB subsequently decided that grounds existed for the appointment of a receiver for Old Hometown. In response to the FHLBB's decision, the FHLBB and Old Hometown entered into a Consent Agreement in March 1987, in which the FHLBB agreed to forbear from appointing a receiver in exchange for Old Hometown's agreement to take certain steps to save the institution.

To satisfy the terms of the Consent Agreement, Old Hometown's board of directors submitted an application to the FHLBB for a voluntary supervisory conversion. The application was based on a business plan developed by the National Capital Group ("NCG"), a Washington, DC-based thrift consulting firm.[2] Under this business plan, a holding company would be formed by a group of investors, who would then acquire 100% of the stock in a newly created "interim savings and loan [to] be chartered by the FHLBB," which would be known as "New

---

1. The United States has also moved to dismiss certain claims and for summary judgment on plaintiffs' and plaintiff-intervenor's takings claims. A ruling on those issues has been deferred pending the outcome of the liability issues dealt with here.

2. As discussed *infra,* the principals in NCG later became the principal investors in New Hometown.

Hometown." Thereafter, the interim institution would merge with Old Hometown, and New Hometown would be the surviving thrift. The group of investors would then hold all of the stock in the surviving institution. Def.'s Ex. 9 at 9.[3] The plan included a list of regulatory forbearances that the investors in the acquiring institution, New Hometown, requested from the FHLBB and FSLIC before they would agree to provide the capital needed for the conversion. In particular, the investors wanted forbearances in connection with New Hometown's ability to meet its regulatory capital requirement without regard to Old Hometown's liabilities. In addition, the investors wanted to use the resulting "goodwill" created by the conversion of Old Hometown into New Hometown to meet the regulatory capital requirements for insured thrifts. The business plan indicated that even with these forbearances and the goodwill, however, New Hometown would not fully meet the three percent regulatory capital requirement set forth in 12 C.F.R. § 563.13(b).

The Bank Board sought clarification of various aspects of the business plan, and requested justification for the separate waivers and forbearances requested by the investor group. FDIC's Exs. 19 & 20. With the understanding that the regulatory waivers and forbearances were part of the plan, on December 22, 1987, the Bank Board provisionally approved the conversion of Old Hometown from a savings and loan association to a stock-based organization. Def.'s Ex. 12.

On the same day, the Bank Board also sent a separate letter to Old Hometown's president, Theo R. Webb, setting forth the regulatory forbearances and treatment of goodwill that the Bank Board would grant in connection with New Hometown's acquisition of Old Hometown. These forbearances and the agreement regarding the treatment of goodwill are at issue in this litigation. In particular, this letter states that it "confirms the understanding that the Federal Home Loan Bank Board ('Bank Board') and the

Federal Savings and Loan Insurance Corporation ('FSLIC') will waive, or forbear from taking actions to enforce, certain regulatory requirements applicable to [New Hometown]" as provided in five separate paragraphs. These goodwill forbearances included:

1. The acquisition of control of Hometown Federal by Hometown Financial will be deemed to have been an acquisition instituted for supervisory reasons. Therefore, the FSLIC will forbear, for a period of five years following consummation of the acquisition, from exercising its authority under Section 563.13 ... for any failure of Hometown Federal to meet the net worth requirement of Section 563.13 arising solely from: (a) scheduled items attributable to the assets of Hometown Federal existing at the effective date of the acquisition ... that are or become assets classified as "Substandard," "Doubtful" or "Loss" ...; (b) operating losses on acquired assets; (c) capital losses sustained by Hometown Federal upon disposition of acquired assets; (d) Hometown Federal's liabilities ... or Hometown Federal's net worth deficiency existing at the effective date of the acquisition.

. . . .

5. For purposes of reporting to the Bank Board, the value of any intangible asset resulting from the application of pushdown accounting may be amortized by Hometown Federal over a period of 25 years by the straight-line method.

FDIC's Ex. 25.

Following provisional approval of the conversion, HFI was organized for the purpose of serving as the holding company for the interim savings and loan that would finance the newly-organized New Hometown, which would then merge with Old Hometown. Thereafter, in February 1988, Old Hometown and HFI submitted a new business plan to the Bank Board in support of their application for a waiver of the growth limitation applicable to institutions wishing to accept deposits over the amount that would other-

---

**3.** Unless otherwise noted, all citations to exhibits throughout this opinion refer to the parties' cross-motions for summary judgment on liability: the government's September 14, 1999 motion; FDIC's September 13, 1999 motion; and plaintiffs' September 3, 1999 motion.

wise be authorized under the FHLBB's regulatory capital requirements. The Bank Board approved this growth waiver on April 1, 1988. The waiver letter provided: "the [business] plan is considered acceptable for supervisory purposes. Progress toward the stated goals will be routinely monitored throughout the course of the plan. Further, it is expected that the converted Hometown will attain minimum capital compliance by the end of the fifth year of operation, the expiration point of the forbearance." FDIC's Ex. 29.

All that remained before New Hometown could open for business was final Bank Board approval. Prior to seeking that final approval, Old Hometown and HFI submitted an amended application to the FHLBB which noted the creation of CFHI. The amended application proposed that CFHI would be the majority shareholder in HFI, and the majority shareholders of CFHI would be Messrs. Weintraub and Mayberg, the two principals for NCG.[4] Under the amended application, HFI still intended to create and capitalize an "interim" savings and loan for the purpose of merging with Hometown and becoming the surviving institution. FDIC's Ex. 30.

The amended application also included a revised business plan that contained new market profiles, operating strategies, and financial projections and assumptions that differed from the original plan. The new business plan, however, retained the inclusion of supervisory goodwill and the regulatory forbearances identified in the December 22, 1987 letter to Mr. Webb from the Bank Board. The new plan stated that New Hometown would need five years to become a profitable institution. FDIC's Exs. 28 & 30.

During the spring of 1988, the Bank Board evaluated the revised business plan and the merits of awarding approval for the voluntary supervisory conversion. An April 20, 1988 memorandum from FHLBB Supervisory Agent David E. Mooney to his superiors sets out the pros and cons of accepting the conversion proposal. Under the proposal, a

holding company was to be capitalized by the investor group NCG in the amount of $2,500,000. The investor group would then capitalize an interim savings and loan in the amount of $2,050,000, for the sole purpose of purchasing Old Hometown and becoming the surviving institution, New Hometown. FDIC's Ex. 16. The memorandum states: "To facilitate this conversion the investors are requesting several forbearances by the FSLIC." The memorandum also states that the business plan includes the creation of goodwill and a twenty-five year amortization period. Further, the memorandum explains that the business plan is contingent upon the Bank Board granting New Hometown a growth waiver to authorize the extreme growth anticipated in the plan. In the end, the supervisory agent recommended approval:

> The subject applications provide an unassisted solution to a problem case where FSLIC assistance may be necessary should other alternatives be sought. Based upon our review of the business plan, it appears that a viable institution would result from the supervisory conversion as proposed. The overriding concern is the capital position which is projected to remain below 3 percent of liabilities during the first three years subsequent to the conversion. The poor capital position is attributable to excessive growth during the first two years. The growth strategy is also a significant concern.
>
> We recommend approval of the subject applications for a voluntary supervisory conversion of Hometown. The pros of a viable unassisted solution and infusion of external capital outweigh the cons of excessive liability growth and temporary capital deficiency. . . .

FDIC's Ex. 30 at 7.

On June 28, 1988, in FHLBB Resolution No. 88–513, the Bank Board granted final approval of the conversion of Old Hometown into New Hometown. The final approval was made subject to several conditions, including the requirement that CFHI, the major

---

**4.** As noted *supra,* NCG was the consulting group that had devised the original business plan prior

to submission of this new business plan.

shareholder in the acquiring entity HFI, sign a Regulatory Capital Maintenance Agreement ("RCMA") and that HFI sign a Regulatory Capital Maintenance/Dividend Agreement ("RCMDA"). These agreements are also at issue in this litigation. In the first, CFHI promised to maintain New Hometown "at a level or above the Regulatory Capital Requirement." The CFHI RCMA defines "Regulatory Capital Requirement" as follows:

> "Regulatory Capital Requirement" means the Institution's regulatory capital requirement at a given time computed in accordance with 12 C.F.R. § 563.13(b), or any successor regulation thereto, *except that during the five-year period following consummation of the acquisition of the Institution, the Regulatory Capital Requirement of the Institution shall take into account forbearances granted by the FHLBB by letter dated December 22, 1987 and those granted by the Principal Supervisory Agent of the Federal Home Loan Bank of Indianapolis by letter dated April 1, 1988.*

FDIC's Ex. 38 at 2 (emphasis added). Identical language was included in the RCMDA signed by HFI. FDIC's Ex. 39.

Both agreements also included a section labeled "Miscellaneous Provisions" that contained the following language regarding references to "Regulatory Capital": "All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, *it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquiror's obligation under this Agreement.*" FDIC's Exs. 38 & 39 at 5 (emphasis added.)

With the adoption of the Bank Board Resolution and execution of the capital maintenance and dividend agreements, the conversion was complete and New Hometown opened for business on June 30, 1988.[5] It is not disputed that New Hometown identified approximately $6 million in goodwill as a result of the transaction, and that this resultant goodwill was counted by New Hometown toward meeting its regulatory capital requirements.

The undisputed record shows that during its first year of operation, New Hometown's assets increased by 39.3% to $76,023,000 and its deposit liabilities increased by 25.3% to $67,877,000. These amounts fell short of the projected increases in the approved business plan, which had anticipated an increase in assets of 94.6% to $109,000,000 and an increase in deposit liabilities by 99.3% to $98,171,000. However, despite New Hometown's weaker than expected performance, the Bank Board approved another growth waiver for New Hometown and an amended business plan in June 1989. Def.'s Ex. 29.

On August 9, 1989, FIRREA was passed, and shortly thereafter, New Hometown was told that the Bank Board could no longer honor the forbearances it had agreed to in the December 22, 1987 letter. New Hometown was ordered to submit a plan to come into compliance with the regulatory capital requirements without regard to the December 22, 1987 forbearances, including the understandings with respect to goodwill. New Hometown accordingly submitted a plan on January 5, 1990, but it was rejected by the Bank Board because it relied upon the December 1987 forbearances and did not include an immediate infusion of any capital to the thrift.

Following the passage of FIRREA, the Office of Thrift Supervision ("OTS") (the successor to the Bank Board) performed a financial "examination" of New Hometown's operations which showed that by the end of December 1989, New Hometown had incurred a net loss of $708,000 since the June 1988 conversion. Pls.' Ex. 39 at 13. OTS' examination resulted in a report that stated that New Hometown had engaged in a number of unsafe and unsound lending practices.[6]

---

5. On January 12, 1989, an internal FHLBB memorandum confirmed that plaintiffs had satisfied all of the conditions set forth in the June 28, 1988 Approval Letter. Pls.' Ex. 34.

6. For example, OTS noted that New Hometown was out of compliance with a number of provisions set forth in the December 22, 1987 approval letter: 1) to set underwriting standards in accordance with generally accepted standards in

OTS subsequently informed HFI that in order to avoid an OTS takeover, it would need to infuse sufficient capital into New Hometown "to bring Hometown Federal Savings Bank into full capital compliance [under 12 C.F.R. § 563.13(b)] by June 30, 1990." Pls.' Ex. 40. Based on HFI's failure to infuse those funds and to propose a post-FIRREA plan that satisfied the regulators, the OTS placed New Hometown in receivership on June 8, 1990. Pls.' Ex. 41.

### B. The Present Litigation

Plaintiffs HFI and CFHI filed their suit in this court on August 30, 1990. The complaint named as defendants the United States, FSLIC, FHLBB, and the FDIC.[7] In their complaint, plaintiffs assert that the enactment and implementation of FIRREA, combined with the subsequent seizure of the bank, amounted to a breach of contract that entitles them to rescission of the contract and an award of restitution and lost profits. The complaint also charges that the government's actions amounted to a taking without just compensation in violation of the Takings Clause of the Fifth Amendment, and denial of their due process.

On November 12, 1996, the FDIC filed a motion to intervene together with a complaint in intervention. The plaintiffs moved to dismiss. On March 14, 1997, the FDIC was allowed to intervene as a plaintiff, but consideration of HFI and CFHI's specific objections was stayed. The parties have agreed that the issues surrounding the FDIC's intervention and its role in this litigation should be stayed pending the outcome of these cross-motions on contract liability.

In September 1999, the United States moved to dismiss portions of the plaintiffs' and plaintiff-intervenor's complaints, and for summary judgment on liability. The plaintiffs and plaintiff-intervenor simultaneously filed motions for summary judgment on their breach of contract claims. Supplemental briefs were filed in 2001, following the Feder-

al Circuit's ruling in *California Fed. Bank, FSB v. United States,* 245 F.3d 1342 (Fed. Cir.2001), *cert. den.,* 534 U.S. 1113, 122 S.Ct. 920, 151 L.Ed.2d 884 (Jan. 22, 2002) (hereinafter *Cal Fed*), and again after oral argument, which was held on February 28, 2002.

### DISCUSSION

### A. Standard of Review

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Cal Fed,* 245 F.3d at 1346. At issue on these cross-motions is whether a contract exists and, if so, whether it was breached by FIRREA. This presents mixed questions of law and fact. *Cal Fed,* 245 F.3d at 1346. In deciding whether summary judgment is appropriate, it is not the court's function to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. 2505.

### B. The Correspondence, Memoranda, Resolutions, Forbearance Letters, and Regulatory Maintenance and Dividend Agreements Confirm the Existence of a Contract Between Plaintiffs and the Government

The central issue presented by these motions is whether the Bank Board's approval of the conversion of Old Hometown into New Hometown—together with the correspondence, memoranda, forbearance letters, and regulatory maintenance and dividend agreements that were part and parcel of the Bank Board's approval of the conversion—gave rise to a contract between the United States and plaintiffs for the benefit of plaintiff-inter-

---

the banking industry; 2) to adopt loan appraisal practices and procedures conforming to the best established practices in the industry; and 3) to conduct internal audits, thereby violating the requirement to establish and maintain adequate checks and controls. Def.'s Ex. 33.

**7.** FHLBB of Indianapolis filed a motion to dismiss. That motion is currently pending, but is not material to the motions which are the subject of this opinion.

venor.[8] The government contends that the above-noted documents did not form a contract because these documents simply reflect the exercise of the government's "regulatory" functions and not a discretionary contracting activity. The government argues that the Supreme Court's holding in *Winstar*, which made the government liable for the regulatory changes occasioned by FIRREA, is limited to cases involving "assistance agreements" or "supervisory agreements," which are not at issue here.[9] The government asserts that *only* in those instances did the government regulators have the express statutory authority to guarantee investors against the risk of future regulatory changes such as FIRREA. The government argues that where, as here, the thrift conversion took place *without* an assistance agreement, the federal regulators did not have the statutory authority to make binding promises with regard to risk of loss in the event of a regulatory change, and that these plaintiffs therefore had no binding agreement.

Plaintiffs and plaintiff-intervenor argue in response that the Federal Circuit has resolved this issue in their favor in *Cal Fed*. Specifically, plaintiffs and plaintiff-intervenor state that in *Cal Fed*, the Circuit determined that federal regulators are bound by the contracts they entered into in connection with "unassisted" transactions as well as "assisted" transactions. According to plaintiffs and plaintiff-intervenor, the *Cal Fed* ruling provides that if the contemporaneous documents establish that the acquiring entity agreed to take over the failing thrift in exchange for favorable regulatory treatment of supervisory goodwill and other forbearances, a binding contract was formed. Plaintiffs and plaintiff-intervenor contend that under the precedent of *Cal Fed*, they have established the existence of a contract. For the

reasons that follow, the court agrees with plaintiffs and plaintiff-intervenor.

■ The court's analysis begins with the Federal Circuit's holding in *Cal Fed*. The Circuit reiterated the well-settled principle that "any agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." *Cal Fed*, 245 F.3d at 1346 (quoting *Massie v. United States*, 166 F.3d 1184, 1188 (Fed.Cir.1999)). In this context, the Circuit rejected the government's contention that the *Winstar* holding turned on the existence of an assistance agreement with an express integration clause: "The fact that Cal Fed did not enter into an assistance agreement [incorporating the forbearance letters] ... is not dispositive of the issue of contract formation between the government and Cal Fed." *Id.* at 1346–47. Instead, the Circuit agreed with the trial court that "if the factual records of individual cases show intent to contract with the government for specified treatment of goodwill, and documents such as correspondence, memoranda and [FHLBB] resolutions confirm that intent, the absence of an [assistance agreement] or [supervisory action agreement] should be irrelevant to the finding that a contract existed." *Id.* at 1347 (quoting *Cal Fed*, 39 Fed. Cl. 753, 773 (1997)). Accordingly, based on the contemporaneous documentation surrounding the unassisted transactions in *Cal Fed*, the Federal Circuit concluded that the FHLBB and FSLIC were contractually bound to recognize the supervisory goodwill and amortization periods reflected in the forbearance letters issued in connection with

**8.** Unlike many other *Winstar*-related cases, in this instance, the shareholder-investors—represented by HFI and CFHI—signed the subject contracts.

**9.** Under § 1729(f)(2), FSLIC was authorized, "in order to facilitate a merger or consolidation of an insured institution ... with another insured institution ... to (i) purchase assets or assume liabilities, (ii) make loans ... (iii) *guarantee such other institution ... against loss by reasons for*

*such institution's merging with an insured institution."* Def.'s Reply at 3. With respect to acquisitions by non-insured institutions, such as holding companies, § 1729(f)(3) applied, which states that FSLIC was authorized to "provide any person acquiring control of or merging with ... an insured institution, with such financial assistance as it could provide an insured institution under this subsection." Def.'s Reply at 3–4.

their approvals of Cal Fed's acquisition of certain insured thrifts.

Of particular importance to the government's argument in this case is the Federal Circuit's rejection of the government's contention in *Cal Fed* that FHLBB and FSLIC did not have the legal authority to enter into contracts guaranteeing against the risk of loss in the event of a regulatory change absent an assistance agreement. The Circuit expressly stated:

> We have already answered the question of whether the FHLBB and the FSLIC have the authority to enter into contracts like these in the affirmative [in *Winstar*, 64 F.3d at 1548]. Since its inception, the FSLIC has had the authority under 12 U.S.C. § 1725(c)(3) to make contracts. Further, both the FSLIC and its supervisory agency, the FHLBB, have had "the authority both to extend assistance to acquirers of insolvent FSLIC-insured thrifts, 12 U.S.C. § 1729(f)(2)(A) (repealed), and to set minimum capital limits on a case-by-case basis, 12 U.S.C. § 1730(t)(2) (repealed)."

*Id.* (internal citations omitted). Having resolved the contract issue in favor of Cal Fed, the Circuit went on to hold that FIRREA had caused a breach and to analyze the proper measure of plaintiff Cal Fed's damages.

In supplemental briefs filed with this court following the *Cal Fed* decision, the government argues that "notwithstanding the *Cal Fed* panel's reliance on the three above-cited statutes, none of them provide support for plaintiffs' claim in this case." The government contends that "to date, neither the Supreme Court nor the Federal Circuit has addressed the question of whether the FHLBB had the authority to guarantee a thrift holding company such as HFI or CFHI against the risk of loss from regulatory change. Although these courts found that the FHLBB had the authority to guarantee against loss, their decisions were expressly predicated on an analysis of 12 U.S.C. § 1729(f)(2) (1988)." The government argues that 12 U.S.C. § 1729(f)(2) was applicable *only* to acquisitions by "insured institutions," whereas here, the government argues that because Old Hometown was acquired by two

holding companies, HFI and CFHI, § 1729(f)(2) is inapplicable by its plain terms.

In the alternative, the government argues that even if the transaction that converted Old Hometown into New Hometown was in fact a merger of the insured "interim" thrift, New Hometown, and Old Hometown, there is no dispute that the government did not provide any financial assistance as part of the transaction, and thus could not guarantee the plaintiffs against the risk of loss based on a regulatory change. The government contends that FHLBB only had the statutory authority to guarantee against the risk of a regulatory change "in assisted or [cash] transactions."

The government argues that the plaintiffs' and plaintiff-intervenor's reliance on FSLIC's general authority under § 1725(c) to support their contract claims is misplaced, because § 1725(c) did not give the FSLIC authority to assume the risk of loss in the event of a regulatory change. The government argues that contrary to the Circuit's holding regarding § 1725(c), that section only authorized the FSLIC to enter into contracts; it did *not* authorize the government to contract against the risk of loss in "unassisted" thrift mergers, because according to the government this would "render 12 U.S.C. § 1729(f) [with respect to assistance agreements] superfluous."

After carefully reviewing and considering the government's arguments, it appears to this court that the government is asking it to ignore the *Cal Fed* holding or to find that *Cal Fed* was wrongly decided. This court cannot embrace either option. This court is bound by the precedent of the Circuit, and thus cannot ignore the plain statements in *Cal Fed* holding that the FHLBB and FSLIC did have the legal authority to enter into contracts placing the risk of regulatory change on the government in situations not involving "assistance agreements" or "supervisory agreements." Similarly, this court cannot ignore the Circuit's holding that the FSLIC's general contracting authority is sufficient to establish a binding commitment to bear the risk of a regulatory change. Rather, this court must accept that under the *Cal Fed* ruling, if all of the necessary ele-

ments of contract formation are present, the parties are bound by the terms of that contract. *See id.* at 1347–48.

■ In view of the foregoing, the court finds that there is nothing in the facts of this case to distinguish it from the facts that gave rise to the contract in *Cal Fed.* The government's effort to distinguish the cases from one another—on the grounds that the instant case involves a voluntary supervisory conversion by a holding company acting through a newly-created insured thrift—is without merit. First, the June 28, 1988 Resolution 88–513 expressly states that the FHLBB approved "a voluntary supervisory conversion" in which "[Old Hometown] will be simultaneously acquired by [HFI] through a *merger* into [New Hometown], an interim federal stock savings bank that would be organized and acquired by the Acquiror." Def.'s Ex. 19 (emphasis added). Thus, this case involves merger.

Second, even if Old Hometown was "acquired" by a holding company and not merged with it, § 1729(f) provided the FSLIC and FHLBB with the authority to offer the same types of assistance in transactions involving both insured thrifts and uninsured institutions.[10] Therefore, the subject transaction, like the transaction in *Cal Fed,* occurred in a context where financial assistance *could* have been provided, but was not part of the bargain. Instead, in this case, also as in *Cal Fed,* New Hometown's investors bargained for other benefits. As discussed above, *Cal Fed* expressly held that

liability for a breach claim based on FIRREA is not limited to situations where the FSLIC offered cash assistance. In such circumstances, the issue of the government's legal authority to enter into a binding contract, which placed the risk of regulatory change on the government, must be resolved in favor of plaintiffs and plaintiff-intervenor.[11]

■ The only issue left for the court to decide in this vein is whether plaintiffs' agreement to acquire Old Hometown and to infuse the $2,050,000 in capital into the converted institution was made in exchange for the forbearances and treatment of goodwill that were given by the FHLBB. A review of the undisputed facts demonstrates that a contract was established. The original conversion application identified the forbearances and goodwill treatment that were a condition precedent for the investors to infuse capital into Old Hometown, and subsequent correspondence confirmed the significance of the forbearances and treatment of goodwill. For example, the acquirors stated in the March 27, 1987 amended business plan:

> Hometown is of the opinion, that the FHLBB's voluntary supervisory conversion process offers the only feasible alternative to permit Hometown to implement its business plan and attain compliance with current net worth requirements.... Specifically, the investors are requesting certain regulatory forbearances and legal

---

10. See *supra* note 9, discussing § 1729(f). The government states that the FSLIC's right to offer "financial assistance" did not extend its authority to enter into contractual relationships guaranteeing against loss. While the government concedes that "financial assistance" was not defined in the statute, it argues that when the statute is viewed as a whole, it is clear that Congress did not intend to give the FSLIC that right. In particular, it argues that "financial assistance" is different from a guarantee. The court disagrees. It appears from the statute that Congress intended to give the FSLIC the same authority with respect to acquisitions by holding companies as it did with respect to insured institutions. The court finds that the term "financial assistance" does not exclude guarantees against risk of loss, because such guarantees are certainly a form of "financial assistance." Moreover, with respect to the present transaction, the holding company

created an insured thrift to serve as the merger vehicle. Certainly, the FSLIC *could* have offered a guarantee in such circumstances. Indeed, the FHLBB noted that one advantage of the proposed merger was that it would not require cash assistance. FDIC's Ex. 30 at 7. Accordingly, the court finds that the present transaction is legally similar to the *Cal Fed* transaction.

11. While the government insists that the Circuit's reading of § 1725 must be wrong because it makes the express authority for providing financial guarantees in § 1729 unnecessary, the court is not free to reject the Circuit's ruling. Moreover, because this case involves an agreement within the ambit of § 1729, like the agreements in *Cal Fed,* it is not necessary for the court to reach the issue.

indemnifications that Hometown believes are necessary to preserve Hometown's capital during the implementation period of this business plan.

FDIC's Ex. 13 at 13. This, and other correspondence, makes it plain that these items were required to secure the cash infusion from the HFI and CFHI investors to effectuate the conversion. The FHLBB's forbearance letter is referenced and affirmed in the FHLBB's final approval, and is also expressly referenced in the specific capital maintenance and dividend agreements signed by plaintiffs. There is simply no doubt that the forbearances and treatment of goodwill were requested from and granted by the government as part of the bargained-for exchange with plaintiffs.

Indeed, both the RCMA and RCMDA plainly reveal that there were reciprocal promises made as part of the conversion transaction. Each agreement plainly states: "This Agreement shall be deemed a contract made under and governed by Federal law." FDIC's Exs. 38 & 39 at 4. In addition, both of the agreements expressly identify the "forbearances granted by the FHLBB by letter dated December 22, 1987 and those granted by the Principal Supervisory Agent of the [FHLBB] by letter dated April 1, 1988 [the growth waiver]." *Id.* at 2.

In sum, the court finds that the facts and circumstances surrounding this agreement—the correspondence, letters of forbearance, approvals, and regulatory maintenance and dividend agreements which lead to the conversion of Old Hometown into New Hometown through the infusion of capital into the surviving institution—all establish the parties' intent to contract for specified forbearances and treatment of goodwill. All of the elements necessary for contract formation are present, and therefore the court finds that a contract was formed between HFI, CFHI, and the government, and that the government is bound by the terms of that agreement. The court now turns to the government's various contentions that FIRREA did not cause a breach of that contract.

## C. Plaintiffs Did Not Assume the Risk of Regulatory Change

■ The government argues that even if there was contract, FIRREA did not cause a breach because the contract placed the risk of a regulatory change on plaintiffs. The government contends that plaintiffs agreed—in the RCMA and RCMDA—to provide additional capital in the event that regulatory requirements changed. Specifically, the government points to the "Miscellaneous Provisions" section in both documents, which states: "All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquiror's obligation under this Agreement." FDIC's Exs. 38 & 39 at 4 (emphasis added). The government contends that by virtue of this clause, plaintiffs assumed the risk that they might be required to provide additional capital if there was a regulatory change such as FIRREA. The government explains that in *Winstar,* the Supreme Court expressly noted that the government is not liable where it "expressly reserved the right to change the capital requirements without any responsibility to the acquiring thrift." *Winstar,* 518 U.S. at 869 n. 15, 116 S.Ct. 2432 (citing *Guaranty Fin. Servs., Inc. v. Ryan,* 928 F.2d 994, 999–1000 (11th Cir.1991)). The government contends that the language that placed the risk of a regulatory change on the private parties in *Guaranty* is exactly the same as the language used in the RCMA and RCMDA in this case. Accordingly, the government argues that any damage to plaintiffs and plaintiff-intervenor was not caused by passage of FIRREA, but instead by plaintiffs' failure to provide the regulatory capital necessary to meet FIRREA's requirements.

For their part, plaintiffs and plaintiff-intervenor argue that the above-cited language does not mean that plaintiffs assumed the risk of any regulatory change in the capital requirements. Plaintiffs and plaintiff-intervenor argue that in contrast to the agreements in *Guaranty,* which did not make the key language subject to the forbearances that were obtained in the *Guaranty* transac-

tion,[12] the Hometown agreements include a specific, bargained-for exception for regulatory capital, an exception expressly reflected in the agreement's definition of "Regulatory Capital Requirements." Specifically, both agreements define "Regulatory Capital Requirement" as:

> [Hometown's] regulatory capital requirement at a given time computed in accordance with 12 C.F.R. § 563.13(b), or any successor regulation thereto, *except that during the five-year period following consummation of the acquisition of the Institution, the Regulatory Capital Requirement ... shall take into account forbearances granted by the FHLBB by letter dated December 22, 1987 and those granted by the Principal Supervisory Agent of the Federal Home Loan Bank of Indianapolis by letter dated April 1, 1988.*

FDIC's Exs. 38 & 39 at 2 (emphasis added). Plaintiffs and plaintiff-intervenor argue that the two provisions must be read together, and that to the extent there is an inconsistency, the more specific provision defining regulatory capital controls over the more general. Plaintiffs and plaintiff-intervenor argue further that to read the provision otherwise would conflict with the Federal Circuit's interpretation of similar language in *Winstar. See Winstar*, 64 F.3d at 1540–42.

The court agrees with plaintiffs and plaintiff-intervenor that the so-called *"Guaranty* clause" did not shift the risk of regulatory change to plaintiffs in the present case. In contrast to *Guaranty*, the agreements in this case *expressly* incorporated the forbearances by reference and made the agreements subject to those forbearances. The general language indicating that "regulations will include any successor regulation" and that it is "expressly understood that such amendments may increase the Acquirer's obligation" must be read together with the specific provision governing the regulatory capital requirement, for which the definition expressly incorporated the forbearances contained in the December 22, 1987 letter and the April 1, 1988 growth waiver.

It is well-settled that a specific contract provision will control over a general provision. *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 351 F.2d 972, 980 (1965) (holding that under the "settled rule that where an agreement contains general and specific provisions which are in any respect inconsistent or conflicting, the provision directed to a particular matter controls over the provision which is general in its terms"). Here, in contrast to *Guaranty*, the parties *specifically* identified how the forbearances should be treated. Therefore, the general proviso regarding changes to the regulations must be read to mean that the proviso is subject to that specific exception. As such, the court finds that plaintiffs did not assume the risk of a regulatory capital requirement change during the five-year period in which the forbearances were in effect. Since FIRREA was passed within that five-year period, and since the legislation unquestionably took away those forbearances and the promised use of goodwill, FIRREA resulted in a breach of the agreement by the government.[13]

---

**12.** In *Guaranty*, the Eleventh Circuit stated that while the subject agreement noted the existence of certain forbearances with an asterisk, the continued viability of the forbearances following a regulatory change was not provided for in the *Guaranty* agreement. The *Guaranty* agreement was not made subject to those forbearances. The Circuit explained that under the *Guaranty* agreement, the "Regulatory Capital Requirement [was defined to] mean the Institution's Regulatory capital requirement at a given time [under] § 563.13(b) *or any successor regulation thereto.*" *Guaranty*, 928 F.2d at 999. The Circuit concluded that the asterisk could not be construed to mean that any and all regulatory changes to the regulatory capital requirements were subject to the forbearances. Rather, the Circuit stated, "We interpret the forbearance

provision to mean that the agencies would allow Guaranty to treat supervisory goodwill as regulatory capital so long as the regulatory [sic] remained as it was when the contract was signed." *Id.* Based on *Guaranty*, a simple asterisk without more is not enough to bind the government. But the instant case is different; as discussed above, the definition of "Regulatory Capital Requirement" contained in the RCMA and RCMDA was itself made expressly subject to the bargained-for forbearances, making the intention of the parties with regard to these forbearances plain from the face of the agreement. The cases are clearly distinguishable.

**13.** The court notes that in *Cal Fed*, the court determined that to the extent the parties had

## D. The Question of Whether the Passage of FIRREA Caused Plaintiffs' and Plaintiff-intervenor's Injury Is Not Yet Ripe for Review

The government argues that New Hometown would have failed whether or not Congress ever enacted FIRREA, and therefore the court should grant its motion for summary judgment. According to the government, since FIRREA did not cause any injury in fact, the government cannot be found liable for a breach. The government contends that plaintiffs admitted in their complaint that New Hometown was failing to make its growth targets and was losing money, establishing as a matter of law that New Hometown would have failed regardless of the passage of FIRREA. Thus, according to the government, FIRREA did not cause any harm, and plaintiffs have failed to establish the "causation" element necessary for their damages claims.

In response, plaintiffs and plaintiff-intervenor argue that New Hometown would have survived absent FIRREA. They contend that their losses were not an indication of imminent failure, and they argue that the government knew at the time it provided the forbearances to New Hometown that it would take a number of years for the institution to become profitable. Plaintiffs and plaintiff-intervenor rely on the affidavit of Dr. William J. McGuire as an expert, who states that despite New Hometown's failure to meet its growth projections and to reap profits, the bank would have nonetheless survived and prospered, but for the passage of FIRREA. *See* FDIC's Opp'n to Def.'s Mot. to Dismiss Ex. A. Moreover, plaintiffs contend that in any event, New Hometown's survivability goes to the issue of damages and is not a defense to liability.

The court finds that the issue of New Hometown's financial health and the cause of its damages is not ripe for summary judgment. Plaintiffs ultimately bear the burden of proving their damage claims; whether plaintiffs can meet that burden is a matter that should properly be heard during the damages phase of this case. *See Westfed Holdings, Inc. v. United States*, 52 Fed.Cl. 135, 155–56 (2002). At that time, the court will evaluate plaintiffs' damage theories. There is no doubt that the absence of a causal link between a contract breach and the damages suffered would preclude any recovery. *See Castle v. U.S.*, 301 F.3d 1328, 1341 (Fed.Cir.2002). However, the court reserves ruling on the plaintiffs' damage theories until the next phase of this case.

## E. Material Issues of Fact Preclude Summary Judgment on the Government's Defense of Prior Material Breach

■ In the alternative, the government argues that even if FIRREA resulted in a breach of contract, New Hometown committed prior material breach of the contract, thereby excusing any subsequent breach by the government and absolving the government of liability in this instance. In particular, the government contends two things: 1) that at the time of the alleged breach caused by FIRREA, New Hometown had already violated several conditions of the December 22, 1987 provisional approval letter, which it argues gave the government the right to cancel and withdraw its approval for the conversion and to extinguish the forbearances; and 2) that the FHLBB had reserved the right to apply capital requirements to Hometown in the second year after the conversion in the event that the institution was in financial trouble.

First, the government contends that New Hometown violated the conditions contained in the Approval Letter in numerous respects, three of which were "egregious," and points to three particular alleged failures. According to the government, New Hometown failed to set underwriting standards in adherence with the standards generally accepted in the savings and loan industry. Def.'s Ex. 33 at 5. The government states that this led to unsound lending practices, and contributed to New Hometown's financial problems. Next, the government alleges that the bank

bargained for the treatment of goodwill to extend beyond a specific forbearance period, the good will period controls. Here, the breach occurred

within the five-year forbearance period, therefore the court need not look beyond that period to find a breach.

failed to adopt loan appraisal practices and procedures conforming to the best established practices in the industry. *Id.* at 7. And lastly, the government states that following the conversion, New Hometown failed to maintain adequate audit mechanisms. *Id.* at 2. According to the government, these shortcomings were revealed during the OTS examination performed after the passage of FIRREA, commencing on January 16, 1990.

Although the government concedes that it never threatened to cancel or withdraw its approval of New Hometown's conversion, it argues that it *could* have withdrawn its approval, and thus, plaintiffs and plaintiff-intervenor are not entitled to damages based on FIRREA. Upon discovery of these defects, the government states that the Bank Board would have been justified in invoking the clause of the conversion acceptance to undo the acceptance and the "understanding[s] of the 'forbearance letter.'"

Second, the government argues that one of the agreements expressly allowed the government to require more regulatory capital if the institution's financial well-being was threatened. Specifically, the government relies on a provision discussed in the December 22, 1987 Approval Letter and memorialized in the RCMA and RCMDA:

> [T]he Supervisory Agent may, at any time, release the Acquiror from [the obligation to maintain regulatory capital "at a level consistent with that required by 12 C.F.R. § 563.13 as now or hereafter in effect" or "any successor regulation thereto"] in whole or in part, for the Institution's second year of operations following the effective date of the voluntary supervisory conversion if the Supervisory Agent determines that the regulatory capital shortfall was justified given the Institution's business plan and initial capitalization and that such shortfall would not seriously endanger the Institution.

FDIC's Exs. 38 & 39 at 3. According to the government, this provision demonstrates that the regulators "reserved the right to require

compliance with capital standards if the shortfall was unjustified and would seriously endanger the institution." Because New Hometown was allegedly in such a precarious position, the government argues that the Bank Board would have been justified in rescinding the goodwill and capital forbearances.

Plaintiffs and plaintiff-intervenor argue that New Hometown did not, in fact, violate the terms of the conversion agreement. They first challenge the government's portrayal of the conditions as conditions for approval for the conversion, by countering that they were in reality conditions for securing FSLIC insurance for newly-created institutions such as New Hometown, and not for securing approval of the conversion itself.[14] According to plaintiffs and plaintiff-intervenor, this interpretation is supported by the memorandum sent from Supervisory Agent David Hostetler to New Hometown on January 12, 1989, in which he stated that the FHLBB, "has determined that all conditions contained within the June 28, 1988 Approval Letter have been satisfied." FDIC's Ex. 32.

In addition, plaintiffs and plaintiff-intervenor argue that even if they did violate the agreement, the violations were not material. Plaintiffs and plaintiff-intervenor assert that the government has not established the elements of materiality laid out in the Restatement of Contracts, namely the extent to which: 1) the benefit of the contract was denied; 2) the injured party can be adequately compensated; 3) the failing party will suffer a forfeiture; 4) the failing parties are able to cure; and 5) the failing party comports with standards of good faith and fair dealing. RESTATEMENT (SECOND) OF CONTRACTS § 241 cmts. a & b (1981).

The court agrees with plaintiffs and plaintiff-intervenor that there are material facts in dispute which preclude an award of summary judgment in this instance. Whether New Hometown's actions caused a material breach of the contract is a disputed issue. Not every departure from the terms of a contract

---

14. Plaintiffs and plaintiff-intervenor concede that some of the conditions contained in the document cited by the government were indeed conditions that had to be met within ninety days of the conversion under the terms of the December 22, 1987 approval, but that the three cited by the government here pertained to insurance and *not* the approval.

is sufficient enough to be "material." *Stone Forest Indus., Inc. v. United States,* 973 F.2d 1548, 1550 (Fed.Cir.1992). The Federal Circuit has held that whether a particular breach is material "depends on the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties." *Stone Forest,* 973 F.2d at 1551.

Plaintiffs and plaintiff-intervenor argue that New Hometown complied with the contract in every material respect and that the government acknowledged that fact prior to the passage of FIRREA. Plaintiffs and plaintiff-intervenor point to the FHLBB's memorandum stating that New Hometown had met "all" the terms of the conversion approval letter. FDIC's Ex. 32. In addition, in June 1989, the FHLBB approved another growth waiver for New Hometown: "We acknowledge receipt of your letters dated May 26 and June 6, 1989 regarding proposed growth. The business plan amendment and pro forma statements submitted with the letters have been reviewed.... [T]he amended business plan is hereby approved." Def.'s Ex. 29. These actions by the government are not consistent with a claim of material breach.

According to plaintiffs and plaintiff-intervenors, the government's objections to New Hometown's operations only came to light in the examination that was triggered by FIRREA. In addition, they contend that the findings in the examination report are not factually supported, and that the government has made its arguments by pointing to only selective subparts of the relevant provisions taken out of context. For example, according to the FDIC, the results of the 1990 OTS examination show that the conditions were complied with, and not violated as alleged by the government. According to plaintiffs and plaintiff-intervenor, Hometown *did* in fact establish the policies and procedures demanded by the December 1987 approval letter.

In such circumstances, the court finds that there are genuine issues of material fact in dispute regarding the existence of a prior breach. Moreover, there is no doubt that the government has failed to present evidence to establish that the alleged breaches, if they occurred, were material as a matter of law. The Federal Circuit has stated:

> Not every departure from the literal terms of a contract is sufficient to be deemed a material breach of a contract requirement, thereby allowing the nonbreaching party to cease its performance and seek appropriate remedy. The standard of materiality for the purposes of deciding whether a contract was breached "is necessarily imprecise and flexible." The determination depends on the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties.

*Stone Forest,* 973 F.2d at 1550–51 (quoting RESTATEMENT (SECOND) § 241 cmt. a). Tested by this standard, the court finds that the government has failed to make its case that, as a matter of law, New Hometown's actions were sufficiently material that the government would have been justified in disavowing the forbearances it granted at the time of the conversion and demanding that New Hometown meet all regulatory capital requirements.

The government's reliance on the agreement provision giving it the right to demand more capital from Hometown is also without merit, for the same reasons. The government alleges that in the December 22, 1987 Approval Letter, the FHLBB reserved for itself the option to "negate" the "understandings" between the parties in the event that Hometown's capital shortfalls were found to be "unjustified and would seriously endanger the institution" in the second year after the conversion. Again, the government relies on facts that are in dispute. The government asserts that "New Hometown was in such bad financial shape that it met both of the criteria for imposition of capital standards that was [sic] set forth in the Bank Board conversion documents." This allegation is disputed by plaintiffs, and as such, is not appropriate for disposition via summary judgment.

## CONCLUSION

In view of the foregoing, plaintiffs' and plaintiff-intervenor's motions for partial summary judgment on liability for breach of

contract are **GRANTED** to the extent that the court finds that a contract was established, and that FIRREA resulted in a breach of that contract. The government's motion for partial summary judgment on liability is **DENIED**.

The court will contact the parties during the week of September 9, 2002, to schedule a status conference to discuss next steps in this litigation, including setting a schedule to resolve the outstanding issues concerning the FDIC's standing and the government's motions with respect to plaintiffs' and plaintiff-intervenor's takings, due process, frustration of purpose, and pre-judgment interest claims, as well as plaintiffs' damage theories.