HOMETOWN FINANCIAL, INC., and
Continental Financial Holdings,
Inc., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 90–843–C.

United States Court of Federal Claims.

April 29, 2004.

James H. Falk, Jr., Washington, DC, for plaintiff.

Richard B. Evans, U.S. Department of Justice, Washington, DC, with whom were Stuart E. Schiffer, Deputy Assistant Attorney General, and Director David M. Cohen, for defendant. Maureen A. Delaney, Arlene Groner, Jeffery T. Infelise, and Dan McClain, U.S. Department of Justice, of counsel.

## OPINION

FIRESTONE, Judge.

The long history of this *Winstar*-related case can be briefly summarized as follows: In *Hometown Fin., Inc. v. United States*, 53 Fed.Cl. 326 (2002) ("*Hometown I* ") the court ruled on partial summary judgment that a

contract existed between the government and the plaintiffs, Hometown Financial, Inc. ("HFI") and Continental Financial Holdings, Inc. ("CFH"). Piecing together several documents, the court found that in exchange for the plaintiffs' agreement to infuse $2,050,000 of capital into Hometown Federal Savings Bank ("New Hometown"), the government would give the plaintiffs certain rights in the goodwill created by the transaction and would forbear from enforcing certain regulatory requirements for a period of five years. Among the documents the plaintiffs signed as part of this transaction were regulatory capital maintenance agreements, which provided that if New Hometown fell out of regulatory capital compliance due to losses attributable to New Hometown's management of the institution, the plaintiffs would need to infuse additional capital into New Hometown.[1] Consistent with several other *Winstar*-related cases, the court held that the government's refusal to abide by the forbearances following enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (1989) ("FIRREA"), resulted in a breach of contract with the plaintiffs.[2] *Hometown I*, 53 Fed.Cl. at 337.

In that same decision, the court denied the government's motion for summary judgment on its defense of "prior material breach." The government had argued that the plain-tiffs, as part of their agreement with the government, had agreed to oversee compliance with New Hometown's approved business plan and that the plaintiffs' failure to oversee the bank's compliance would have allowed the government to revoke the promises it made to the plaintiffs without regard to FIRREA. In denying summary judgment, the court stated, "The government has failed to make its case that, as a matter of law, New Hometown management's actions were sufficiently material that the government would have been justified in disavowing the forbearances it granted at the time of the conversion and demanding that New Hometown meet all regulatory capital requirements." *Id.* at 340.

Thereafter, in *Hometown Fin., Inc. v. United States*, 56 Fed.Cl. 477 (2003) ("*Hometown II* "), the court considered the government's motion for summary judgment on the plaintiffs' damage theories. After considering the briefs and arguments, the court determined that there were disputed issues of fact, which precluded summary judgment on the plaintiffs' reliance damage claim for the expenses allegedly incurred in connection with preparing and carrying out the agreement with the government. The court determined that a trial would be needed to resolve the plaintiffs' request for reliance damages. The court further held, however, that there

1. The Regulatory Capital Maintenance/Dividend Agreement stated in part:

 [I.] E. "Regulatory Capital Requirement" means the Institution's regulatory capital requirement at a given time computed in accordance with 12 C.F.R. § 563.13(b), or any successor regulation thereto, except that during the five-year period following consummation of the acquisition of the Institution, the Regulatory Capital Requirement of the Institution shall take into account forbearances granted by the [Federal Home Loan Bank Board] by letter dated December 22, 1987 and those granted by the Principal Supervisory Agent of the Federal Home Loan Bank of Indianapolis by letter dated April 1, 1988. . . .
 [II.] A. During the five (5) year period beginning on the Date of Acquisition, or until such time as the Acquiror completes a public offering of its securities, the Acquiror will cause the Regulatory Capital of the Institution to be maintained at a level at or above the Regulatory Capital Requirement and as necessary, will infuse sufficient additional permanent and

 non-refundable capital, in a form satisfactory to the Supervisory Agent, to effect compliance with such requirement and cure a Regulatory Capital Deficiency during the first quarter after which the Institution fails to meet its Regulatory Capital Requirement; *provided, however,* that the Supervisory Agent may, at any time, release the Acquiror from this obligation, in whole or in part, for the Institution's second year of operations following the effective date of the voluntary supervisory conversion if the Supervisory Agent determines that the regulatory capital shortfall was justified given the Institution's business plan and initial capitalization and that such shortfall would not seriously endanger the Institution.

2. Initially, this litigation also included damage claims by the Federal Deposit Insurance Corporation ("FDIC"), which succeeded to New Hometown's damage claims after it was taken into receivership by the Resolution Trust Corporation. The court granted the FDIC's voluntary motion to dismiss on October 15, 2003.

were no material facts in dispute regarding the plaintiffs' restitution claim and that the plaintiffs were entitled to restitution in the amount of their capital contribution of $2,050,000. The court awarded the plaintiffs partial summary judgment in that amount. The issue of prior material breach was not addressed in the *Hometown II* decision.

The government then moved for reconsideration of the restitution award on the grounds that the court had failed to consider the government's defense of "prior material breach." The government noted that the court had previously held that material issues of fact precluded summary judgment on the defense. The government re-iterated its contention that the plaintiffs had materially breached their contract by mismanaging New Hometown prior to enactment of FIRREA. In particular, the government charged that the plaintiffs' faulty underwriting standards, unsound appraisal practices, and failure to respond to its internal audits amounted to a material breach.

The plaintiffs argued in response that they had not materially breached the contract and that the government had waived the defense, as a matter of law. First, the plaintiffs argued that the government had failed to show how the plaintiffs' alleged mismanagement of the bank caused any damages. Second, the plaintiffs contended that the government knew of New Hometown's management practices prior to enactment of FIRREA and at no time prior to enactment of FIRREA had the government informed the plaintiffs that they were in default of their obligations under the agreement. Accordingly, the plaintiffs argued that the government waived any prior material breach defense.

The court was persuaded that there were genuine issues of material fact in dispute over whether the plaintiffs had materially breached the contract prior to enactment of FIRREA and whether the government had waived the defense. Accordingly, the court ordered a trial to resolve the government's prior material breach defense.

Prior to trial, the parties filed cross-motions for partial summary judgment on the plaintiffs' reliance damage claim. The government charged that the plaintiffs were not entitled to reliance damages because they had not presented any evidence to show that any of the costs incurred in connection with the contract were actually paid by the plaintiffs. The documents the plaintiffs submitted in support of their cross-motion did not establish that the costs they claimed were paid by the plaintiffs. The vast majority of costs were charged to other entities and there was no evidence that the costs charged to the plaintiffs were ever paid.

The government also argued that even if there were proof that the plaintiffs had incurred any of the costs identified in the bills submitted by the plaintiffs, the government would not be liable for the bulk of the reliance damage claim, in any case, because most of the costs had been incurred prior to finalization of the contract. The government argued that under established contract principles, costs incurred in preparation of a contract are not compensable. The court agreed with the government and for the reasons stated at the hearing on the parties' cross-motions for partial summary judgment, the court granted the government's motion for partial summary judgment on February 19, 2004.

On the eve of trial, the plaintiffs moved to strike the government's prior material breach defense, which the court denied.[3] Thereafter, the court heard evidence over a six-day period on the government's prior material breach defense. The trial focused on three issues: (1) whether there was a prior breach; (2) whether the breach was material; and (3) what, if any, damages the government suffered as a result of the plaintiffs' alleged breach.

Based on its consideration of the testimony and exhibits presented at trial, the court finds that the government failed to establish a prior material breach or any losses attributable to the plaintiffs' management of New Hometown. Accordingly, judgment in the

3. A variety of additional pre-trial motions were denied at the pre-trial conference held on February 19, 2004.

amount of $2,050,000 will be entered for the plaintiffs.

## DISCUSSION

The court heard testimony from nine witnesses. Two regulators with the Federal Home Loan Bank Board ("FHLBB"), Jeffrey Sanders, a former supervisory analyst and then a supervisory agent, and John Downey, a former District Director, testified regarding the events leading up to the creation of New Hometown and New Hometown's post-conversion compliance with its agreement with the government. The court also heard from the Office of Thrift Supervision ("OTS") auditor, Brian McDonald, and Federal Deposit Insurance Corporation ("FDIC") auditor, Thomas Crouch. These two auditors were responsible for overseeing their respective agency's audits of New Hometown after passage of FIRREA, in January 1990.

Several New Hometown employees testified, including Theo Webb, President of New Hometown for a portion of the time period in question, and Stephen Clinton, New Hometown's Chief Financial Officer and President after Mr. Webb retired. Both of these witnesses testified about New Hometown's operations before and after the conversion of New Hometown. The court also heard from Lucy Jacob, New Hometown's internal auditor. She testified about her internal auditing responsibilities and the reports she generated in her capacity as internal auditor. Philip Weintraub, the President of National Capital Group, and an investor and officer in both HFI and CFH, also testified regarding his understanding of the agreement with the government and the plaintiffs' role in overseeing New Hometown's compliance with the agreement. Finally, the court heard the testimony of Edward Jones, an expert in accounting and thrift management, who presented the government's damage claim.[4]

### I. Terms of the Contract

The evidence introduced at trial established that prior to the creation of New Hometown, Hometown Federal Savings and

Loan Association ("Old Hometown") experienced serious losses due to its poor underwriting practices and certain appraisal practices. In particular, Old Hometown had incurred significant losses on several "participation" loans, i.e. loans originated by other lenders, which Old Hometown helped to finance. Included in the $6 million New Hometown was allowed to carry on its books as "goodwill" under the terms of its agreement with the government, were the losses Old Hometown had sustained on the "participation loans."

The evidence established that the government included certain provisions in its agreement with the plaintiffs regarding underwriting and appraisal practices, in order to address the problems Old Hometown's practices had created in these areas. In particular, the plaintiffs agreed that New Hometown would adopt specific underwriting procedures, appraisal practices, and internal checks and controls. In final approval of the plaintiffs' application, the FHLBB wrote the Board of Directors of New Hometown on December 22, 1987:

 (e) The Board of Directors of the New Institution shall adopt specific loan and investment policies and procedures ("underwriting standards") which shall set standards for all lending and investment activities of the institution. Such underwriting standards shall be subject to the approval of the Principal Supervisory Agent and in accordance with generally accepted business practices and acceptable standards in the savings and loan industry, the principles of safety and soundness, and the rules and regulations of the Board and the Corporation. Such underwriting standards shall include specific plans and provisions to ensure the diversification of investments and the avoidance of a concentration in a particular type of investment and/or in a particular geographic location;

(f) The New Institution shall adopt loan appraisal practices and procedures con-

---

4. Pursuant to the court's pre-trial order, the government had the burden of proof on its defense and proceeded first. However, for the convenience of the witnesses, the court allowed the plaintiffs to exceed the scope of direct and present their case at the same time.

forming to the best established practices in the industry; ...

(h) The New Institution shall establish and maintain adequate internal checks and controls; ....

In addition, CFH, which in turn owned HFI (and was, thus, the owner of New Hometown), was required to stipulate to the government that for a period of three years following the acquisition it would ensure New Hometown's compliance with its business plan, which included references to New Hometown's commitment to adopt new underwriting and appraisal practices:

CFH shall stipulate to the Corporation that for a period of three years following the date of acquisition of Hometown, (a) New Hometown will operate within the constraints of the business plan, including the projected financial statements, submitted with the application, (b) New Hometown's board of directors shall review New Hometown's compliance with the operating strategies and projections of the business plan at each regular meeting of the board or its executive committee, and (c) any material deviation from the plan, such as but not limited to asset mix, growth in liabilities, or operating strategies, shall require prior written notice of approval by the Supervisory Agent.

On June 28, 1988 CFH provided the government with the stipulation required by the above-stated paragraph:

[CFH] hereby stipulates to the Federal Savings and Loan Insurance Corporation ("FSLIC") that during the three-year period commencing on July 1, 1988 and ending on June 30, 1991:

(a) [New Hometown] will operate within its business plan;

(b) New Hometown's board of directors will review New Hometown's compliance with operating strategies and projections of its business plan at regular meetings of the board or the executive committee of the board; and

(c) material deviations from the New Hometown business plan, such as but not limited to, asset mix, growth in liabilities, or operating strategies, shall be subject to the prior approval of the Supervisory Agent, Federal Home Loan Bank of Indianapolis.

Based on the foregoing, the court finds that the agreement between the government and the plaintiffs included a commitment to oversee New Hometown's efforts to improve its underwriting, appraisal, and internal control practices.

## II. Breach of Contract

The evidence established that New Hometown's management and the plaintiffs, as representatives on its board, endeavored to comply with their obligations regarding underwriting, appraisals, and internal controls, during their first six months of their stewardship. The OTS examination report from that period and testimony from various witnesses confirmed that in accordance with the business plan, New Hometown had produced underwriting policies for virtually all of its loan types and that it had adopted new appraisal policies, as well as a new internal audit program.[5]

The OTS examination report for this period indicates that New Hometown had made great strides in reducing the number of classified assets, i.e. loans that have the potential to fail. The evidence established that the OTS regulators characterized assets with the potential to fail as "substandard, doubtful and loss." In accordance with Insurance Regulation 12 C.F.R. § 561.16c (which was identified in the OTS report), assets that are classified as "substandard" are generally considered inadequately protected by the current net worth and paying capacity of the borrower or of the collateral pledged. "Doubtful" assets have all the weaknesses inherent in those classified as substandard, with the added characteristic that the asset's weaknesses make collection in full questiona-

---

5. Although the government presented evidence to show that several policies had not been submitted to the agency, the OTS report for that period indicates that most of the needed underwriting policies were established. In addition, the testimony of Ms. Jacob established that the internal audit function was established. Finally, the evidence established that New Hometown had written an adequate appraisal policy.

ble and improbable. Assets classified as a "loss" are considered uncollectible.

The 1988 OTS report stated that:

Criticized assets totaled $2.3 million or 3.8% of assets at September 30, 1988. This represents a significant improvement .... The improvement may be attributed mainly to the resolution of, and/or substantial writedown of previously criticized participation loans, *and improved loan underwriting.... New lending guidelines were developed and implemented to control the Institution's exposure to credit risk. Commercial, commercial real estate, consumer, and residential loans are addressed. These policies, for the most part, are detailed and set reasonable limits and procedures for credit approval and collection. The lending review disclosed the policies are generally adhered to by the Institution personnel.*

(Emphasis added). The OTS report noted one area of concern regarding commercial lending policies and procedures. In particular, the OTS stated that New Hometown's commercial real estate lending policies were not adequate and that guidelines should be enhanced to "adequately address construction of commercial real estate ...."

The evidence established that starting in late 1988 and throughout 1989 New Hometown began to experience problems in adhering to the underwriting and appraisal policies developed by New Hometown's board. An internal audit revealed a number of loan department deficiencies that New Hometown did not immediately address.

Ms. Jacob, who was responsible for the internal auditing program at New Hometown, testified about the problems she had found in her audit. She explained that for a period of time she performed audits and brought them to management's attention. She testified that while she did not believe that New Hometown's loan director, Mr. Sam Deiwert, was receptive to her concerns, she believed that others in management were open to her recommendations and took her reports seriously. She indicated that she thought that Mr. Clinton did take her concerns seriously.

Mr. Weinbtraub testified that after New Hometown's board of directors approved New Hometown's policies, day-to-day management was left to the institution's managers and that he was not responsible for addressing the concerns raised by Mrs. Jacob's report. He explained that shortly before and then after FIRREA was enacted in August 1989, his efforts were largely focused in keeping New Hometown from receivership.

Mr. Clinton, New Hometown's Chief Financial Officer and later President, testified that New Hometown endeavored to follow its internal underwriting, appraisal, and auditing policies and that he took Ms. Jacob's concerns very seriously. He further testified that upon learning in 1990 of the government's serious concerns with the lending department at New Hometown, the bank stopped certain lending programs and fired Mr. Deiwert, who had served as its chief loan director.

The criticisms that led New Hometown to change its lending programs and management were the focus of the January 1990 OTS and FDIC examination reports. These reports were at the core of the government's case. Both the OTS and FDIC conducted examinations of New Hometown after passage of FIRREA in January 1990. Although the examination reports contain similar findings, the reports were prepared independently of each other by two separate staffs.

Both reports were very critical of New Hometown's underwriting and appraisal practices and noted New Hometown's failure to address the problems identified in its internal audits. The 1990 OTS report stated that the:

Classified assets increased substantially during the review period. Substandard assets classified at this examination totaled $4.2 million or 6.2% of total assets. This compared unfavorably to the 3.8% ratio at the previous examination.... This deterioration of asset quality is primarily caused by inadequate underwriting and monitoring of lines of credit and commercial real estate loans. Despite the internal audit ... management failed to correct the deficiencies.

The report then detailed various underwriting deficiencies in New Hometown's lending activities. The 1990 OTS report also noted ·appraisal policy concerns. It noted that on "April 25, 1989 Hometown's Board approved an appraisal policy .... However, we have serious concerns relative to appraisals accepted by management ...." In particular, the report focused on the appraisal work of Mr. Raymond Todd. The OTS noted that "Hometown's appraisal policy is sufficiently detailed to guide management. However, it is not followed in practice."

The OTS concluded that given New Hometown's asset problems, New Hometown's loan loss reserve was not adequate and that New Hometown needed to increase its general valuation allowance to $640,000. In particular, the OTS recommended that New Hometown set aside 10% for the $4.2 million in substandard loans and an additional amount for the rest of its loan portfolio. A small amount, $25,000, was identified as a loss. However, there was no evidence to suggest that the $25,000 loss was attributable to loans originated by New Hometown.

At trial, the parties focused on the specific loans that were classified as substandard. It was established that of the $4.2 million in loans that were "classified" by the OTS in 1990, approximately 25% or $1 million had been originated by New Hometown.

In its 1990 examination report, the FDIC reached similar conclusions regarding the asset quality of New Hometown. The FDIC was also critical of New Hometown management's failure to adhere to its internal policies. The FDIC concluded that $4,009,000 of New Hometown's assets should be adversely classified. This amount represented 5.84% of total assets. The report states, "Of this [$4,009,000] amount, $3,442,000 is classified Substandard, $500,000 is classified Doubtful, and $67,000 is classified Loss." The FDIC noted:

> Although this amount is lower than the amounts so listed at the 1986 and 1987

FHLB examinations, it is notably higher than ... the 1988 FHLB examination ....
*While it is acknowledged that a significant dollar volume of the classified assets is represented by long standing problem assets that were obtained prior to current management's presence in the bank.... a significant dollar volume is also represented by credits of more recent vintage .... Although these loans are not classified Doubtful or Loss at this time, they are lacking one or more important and warranted documentation items which could, if not corrected, result in credit deterioration and ultimately increased losses.*

(Emphasis added). The FDIC also determined that New Hometown's loan loss reserve was inadequate.[6]

Both the FDIC and OTS gave New Hometown their lowest ratings in their 1990 examination reports and indicated that without a significant capital infusion by the plaintiffs into New Hometown, the institution was bound to fail. The 1990 OTS examination report states, "Management should seek recapitalization immediately from the institution's holding company, Hometown Financial, Inc., or pursue other outside capitalization including merger."

Significantly, while the examination reports detailed serious problems with New Hometown's underwriting, appraisal, and internal control practices, no government witness testified that the problems with underwriting, appraisal or internal control practices were the cause of New Hometown's financial problems. Nor did any government witness testify that the problems were so serious that the government was considering or would have considered revoking the forbearances it had granted to the plaintiffs on the basis of the criticisms alone, i.e. without regard to FIRREA. Although the OTS questioned management's abilities to "stabilize" the institution, just prior to placing New Hometown into re-

---

6. At trial, the plaintiffs explained that they had questioned the need to increase the loan loss allowances that were recommended by the regulators. They supported their position with a letter from New Hometown's accountants to the effect that New Hometown's loan loss reserve

was sufficient. The plaintiffs also argued that the regulators had failed to take into account the fact that loan losses from Old Hometown were reflected in the goodwill New Hometown carried.

ceivership, it was previously established on summary judgment that the OTS had sought additional capital from the plaintiffs prior to placing New Hometown into receivership. This request for additional capital creates the inference that the regulators would have allowed the plaintiffs to continue their ownership of the institution if they had infused more capital post-FIRREA.[7] As the parties agreed in the *Hometown I* decision, the "OTS subsequently informed HFI that in order to avoid an OTS takeover, it would need to infuse sufficient capital into New Hometown, 'to bring Hometown Federal Savings Bank into full capital compliance [under 12 C.F.R. § 563.13(b) ] by June 30, 1990.'" 53 Fed.Cl. at 332. New Hometown was only placed into receivership after the plaintiffs refused to infuse the additional capital as required by FIRREA.

Most importantly, however, not a single government witness, including Mr. Jones, the government's damage expert, could identify *any* financial loss to the government attributable to the plaintiffs' failures in connection with New Hometown's underwriting, appraisals, or internal control practices. Indeed, the government failed to establish an immediate economic threat to the institution based on the loans originated by New Hometown's management.

As the 1990 FDIC report noted, none of the loans that were classified "doubtful" or "loss" were originated by New Hometown. New Hometown loans were classified as "substandard," meaning that there was only a potential risk of non-payment. Moreover, the 1990 FDIC report made clear that the concerns were largely focused on missing documentation and, thus, the errors could be cured. This is not to say that documentation errors are insignificant. However, the evidence did not show that these loans were inevitably going to fail. Therefore, there is no

basis upon which the court can conclude that the loans were going to result in a loss. Indeed, the government did not dispute the plaintiffs' contention that the substandard loans were paying.

In view of the foregoing, the court finds that the government may have established that the plaintiffs breached the contract by not fulfilling all of the obligations they undertook in the June 1988 Stipulation. However, for the reasons discussed below, the government failed to establish a prior material breach of contract, which would have excused the government from abiding by the forbearances it agreed to with these plaintiffs without regard to FIRREA.

### III. No Prior Material Breach

█ The standards for determining "material breach" before this court are well-settled. The Federal Circuit has made plain that not every departure from the terms of a contract is sufficient to be material. *Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1550 (Fed.Cir.1992). A material breach is a breach that excuses the non-breaching party from continuing performance. *Morganti Nat., Inc. v. United States*, 49 Fed.Cl. 110, 140 (2001), *aff'd*, 36 Fed.Appx. 452 (Fed.Cir. 2002) (citing *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1276 (Fed.Cir. 1999); *Malone v. United States*, 849 F.2d 1441, 1445 (Fed.Cir.1988)) ("A contractor's failure to perform may be excused ... if the contractor can establish that the government materially breached the contract."). Whether a breach is material "depends on the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties." *Stone Forest*, 973 F.2d at 1551 (citing the Restatement (Second) of Contracts Sec. 241 cmts. a & b (1981) ("In determining whether a failure to render or to offer

---

**7.** New Hometown had submitted a capital plan as required by FIRREA on January 7, 1990. As the June 30, 1990 OTS internal memorandum regarding the decision to place New Hometown into receivership explained:

> The plan offered two alternatives for the recapitalization of the institution. One alternative included approximately $4.5 million of financial assistance combined with a $1.3 million

> infusion from the investors for an immediate recapitalization. The other alternative called for operating in a growth mode for five years to establish a positive earnings trend. At the end of 1994, a $6 million capital infusion would be made to raise capital into compliance with the required amount.
>
> Both proposals were rejected.

performance is material, the following circumstances are significant: (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived . . . .")).

■ Taking all of the facts and circumstances into account, the court finds that the plaintiffs' failures in connection with New Hometown's underwriting, appraisal, and internal control practices did not reach the mark of a prior material breach that would have excused the government from abiding by the forbearances it had provided to the plaintiffs. In this case the government had to establish that the plaintiffs' actions were such that the government would have been justified in requiring the plaintiffs to infuse additional capital into New Hometown without regard to FIRREA. In order for the government to have made that case, it would have had to show that the plaintiffs' lending activities, not Old Hometown's, were causing losses to New Hometown. As the March 27, 1989 internal FHLBB legal memorandum introduced by the government explained:

> The 12/22/87 letter provides a forbearance from enforcement of the capital requirement of 563.13 for a 5 year period from the acquisition if the losses arise "solely from operating losses on acquired assets." . . . [I]f the losses were the result of loans originated by the new Hometown after the supervisory acquisition, the losses would not fit into the definition in the forbearance letter.

The government's failure to establish a single dollar of loss attributable to the plaintiffs' underwriting, appraisal, and internal control practices or any imminent losses is fatal to its material breach claim. Not a single government witness testified that any of the plaintiffs loan-related activities of concern resulted in *any loss* to the government prior to FIRREA. Indeed, the government apparently never tried to find out whether any of the loans which were originated by New Hometown resulted in a loss to the institution after the government assumed control of New Hometown after enactment of

FIRREA. The government was the receiver for New Hometown for four years after June 30, 1990. If there was evidence to show that the plaintiffs' lending practices had led to a financial loss, that evidence would have presumably been presented to the court. The inference to be drawn from the absence of that evidence is that the government did not suffer any losses attributable to the loans originated by New Hometown.

In a similar vein, the government failed to establish any imminent threat to the institution that would have justified some other enforcement action that would have led to revocation of the forbearances. The evidence established that New Hometown's lending practices had led the government to classify approximately $1 million of New Hometown's loans as "substandard." The evidence established that the classifications were based on documentation deficiencies and that the loans were in fact being paid. While this classification may have justified the government's request for New Hometown to increase its loan loss allowance, the evidence did not establish that further action leading to revocation of the forbearances was contemplated or would have been required.

In light of the foregoing, the government's reliance on *Admiral Fin. Corp. v. United States,* 57 Fed.Cl. 418 (2003), is misplaced. In *Admiral,* the court found a prior material breach where the bank's actions had led the government to invoke the regulatory capital maintenance agreement prior to enactment of FIRREA. In addition, the court found that the plaintiffs in that case had demonstrated by "word and deed" that they would not meet their obligations under the regulatory capital maintenance agreement. *Id.* at 432. In the case at hand, of course, the government had not invoked the regulatory capital maintenance agreement.

In addition, the evidence established that the plaintiffs were willing to address the problems identified by the OTS and FDIC. The evidence established that in response to the 1990 OTS and FDIC reports, New Hometown's management took immediate action. Mr. Clinton explained that New Hometown stopped making the loans that had caused the regulators the most concern and

fired its loan director. The government contends that New Hometown's response to the OTS and FDIC reports show that New Hometown understood that the problems identified were "material." The court disagrees. Based on the testimony at trial, the court finds that these facts demonstrate that New Hometown's management took the concerns seriously and that steps were taken to immediately address the concerns. The court found Mr. Clinton's testimony regarding his efforts to meet the regulators' concerns to be very credible. These facts demonstrate that New Hometown would have responded to the concerns raised by the government.

The government's reliance on *Christopher Village, LP v. United States*, 360 F.3d 1319 (Fed.Cir.2004), is equally misplaced. In that case, the Federal Circuit noted that where a contractor engages in fraud, those acts always give rise to a prior "material" breach. "At the outset, we note that our case law holds that any degree of fraud is material as a matter of law." *Id.* at 1335 (citing *Joseph Morton Co., Inc. v. United States*, 757 F.2d 1273, 1278 (Fed.Cir.1985)). "We think that the submission of false data generated by companies ... constitutes a material breach as a matter of law at least when the ... company generated those data in a conscious effort to defraud the government." *Id.* at 1336. There is nothing to suggest that the plaintiffs in this case engaged in any fraud. In such circumstances, the government's reliance on *Christopher Village* is unsupported.

In fact, there is nothing in either of the 1990 examination reports or in the testimony at trial to suggest that the government had lost confidence in the plaintiffs' management of the institution, based on the underwriting, appraisal, and internal control issues identified by the government. While there was some reference to concerns with New Hometown's management in one memorandum, the evidence established that the regulators would have allowed the plaintiffs to continue ownership of the bank if they had infused additional capital into New Hometown, after enactment of FIRREA.

For all of these reasons, the court concludes that while the plaintiffs may have breached their agreement with the government, the government failed to establish that any breach was material and would have excused the government from abiding by the forbearances established in the agreement between the government and the plaintiffs.

## IV. Damages

■ The government argues that even if it has failed to establish a prior material breach, the plaintiffs are still not entitled to restitution because the government did not benefit from the plaintiffs' $2,050,000 infusion, which the court has previously determined supports a restitution award.[8] The government contends that because the government sustained an $8 million loss after it ended its receivership of New Hometown in 1994 and because that amount exceeded the net deficit of Old Hometown before the conversion to New Hometown in 1988, the government lost more money after the plaintiffs ran New Hometown than they would have owed had they liquidated Old Hometown. This is simply not the case. The evidence established that prior to the conversion, Old Hometown had a negative net worth of approximately $4 million. However, the evidence established that Old Hometown's assets were worth far less. When the assets were marked to market, the assets were significantly reduced, as reflected by the goodwill New Hometown received after the conversion. This means that had Old Hometown been liquidated prior to the conversion, the government would have collected less from Old Hometown's assets than its balance sheet would have suggested.

In addition, the government cannot hold the plaintiffs accountable for the $8 million

---

8. The government also argues that had the court concluded that the plaintiffs had materially breached the contract that this court would not have been able to grant restitution because a material breach would have rendered the contract a nullity, leaving the plaintiffs with a claim based on an implied-in-law contract. Relief in such circumstances, the government contends, would be outside this court's jurisdiction. Because the court has found that the plaintiffs did not materially breach the contract, it is not necessary for the court to examine this legal question.

loss suffered by the government when it ultimately paid off New Hometown's liabilities four years after the plaintiffs had lost control of New Hometown. As noted above, the government failed to establish that New Hometown's management caused any loss to the government. At best, the evidence established that the plaintiffs were responsible for approximately $1 million in "substandard loans." The government failed to establish that these loans eventually led to losses.

Given the evidence adduced at trial, the court may infer that the $8 million loss sustained by the government in 1994 was either due to the problems New Hometown inherited from Old Hometown at the time of the conversion or were caused by the government's management of New Hometown after it went into receivership. The government failed to tie its losses to the plaintiffs in any way.

The court, therefore, finds that the plaintiffs' $2,050,000 infusion benefitted the government. The $2,050,000 infused into New Hometown helped reduce the losses incurred by the government by virtue of Old Hometown's bad loans.

The court rejects the government's argument that the court should adopt Mr. Jones' expert opinion and deduct from the $2,050,000 the amount of the capital shortfall New Hometown had in 1990. More specifically, the government argues that New Hometown would have had a capital shortfall under FIRREA even if the goodwill and forbearances were restored. Mr. Jones testified that New Hometown would still have had a negative $768,000 shortfall in tangible capital, even with its goodwill restored. Mr. Jones did not, however, testify that this shortfall was attributable to losses generated by New Hometown. As discussed above, the plaintiffs were only required to infuse more capital into the institution if New Hometown was responsible for the failure to meet capital requirements. Indeed, the government understood when it approved the conversion,

that New Hometown would likely fall below capital requirements during its first years of operation. Mr. Sanders of the FHLBB wrote in a March 28, 1988 memorandum:

> Approval of the plan as stated provides an unassisted solution to a problem where otherwise assistance would likely be required. The plan does project an earning stream which would eventually generate an adequate level of capital. In the interim, operation with capital below the minimum capital requirement would occur. Of greater concern, the risks identified could result in a substantial degree of loss, creating a greater liability to the insurance fund. Despite its drawbacks, this alternative should not be discarded.

In addition, Mr. Jones opined that the court could consider approximating a loss to the government based the substandard loans attributable to New Hometown's management. Mr. Jones calculated that New Hometown had generated $1,039,283 in substandard loans. The regulations would have required that New Hometown set aside 10% for a loan loss reserve. Thus, Mr. Jones concluded that the loss attributable to substandard loans would be $103,928. The loss Mr. Jones identified is an approximation and is not based on fact. Thus, it is too speculative to support a reduction in restitution damages.

In granting rehearing, the court stated consistent with Sec. 374 of the Restatement (Second) of Contracts,[9] that the plaintiffs are only entitled to restitution to the extent they conferred a benefit on the government in excess of any loss attributable to actions they may have caused in breach. Here, the court has concluded that the plaintiffs conferred a $2,050,000 benefit on the government. There is no evidence to establish that the plaintiffs caused any loss to the government based on any breach. Accordingly, the plaintiffs are entitled to recover $2,050,000 in restitution.

---

**9.** Restatement (Second) Contracts Sec. 374 (1981) provides:
> (1) Subject to the rule stated in Subsection (2), if a party justifiably refuses to perform on the ground that his remaining duties of performance have been discharged by the other party's

> breach, the party in breach is entitled to restitution for any benefit that he has conferred by way of part performance or reliance in excess of the loss that he has caused by his own breach.

## CONCLUSION

For the above stated reasons, judgment in the amount of $2,050,000 shall be awarded to the plaintiffs. The Clerk shall enter judgment in favor of the plaintiffs in the amount of $2,050,000.