# United States Court of Appeals for the Federal Circuit

04-5116

HOMETOWN FINANCIAL, INC., and
CONTINENTAL FINANCIAL HOLDINGS, INC.,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant.

James H. Falk, Jr., Epstein Becker & Green, P.C., of Washington, DC, argued for claimants-appellees.  With him on the brief was James H. Falk, Sr.

Jeffrey T. Infelise, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant.  With him on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General, and David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, and Richard B. Evans, Attorney.

Appealed from:  United States Court of Federal Claims

Judge Nancy B. Firestone

# United States Court of Appeals for the Federal Circuit

04-5116


HOMETOWN FINANCIAL, INC., and
CONTINENTAL FINANCIAL HOLDINGS, INC.,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant.

_____

DECIDED:  May 27, 2005

_____


Before LOURIE, CLEVENGER, and LINN, <u>Circuit Judges</u>.

CLEVENGER, <u>Circuit Judge</u>.


The United States appeals from the decision of the Court of Federal Claims awarding Hometown Financial, Inc., and Continental Financial Holdings, Inc., (collectively "Hometown") $2,050,000 for breach of contract.  Because there is a contract between the plaintiffs and the government, because the contract does not shift the risk of regulatory change to the plaintiffs, and because the government cannot demonstrate clear error in the trial court's conclusion that there was no prior material breach on the part of the plaintiffs, we affirm.

I

This is a <u>Winstar</u>-type case. <u>See</u> <u>United States v. Winstar Corp.</u>, 518 U.S. 839 (1996). The judgment and underlying findings and decisions from which the United States appeals can be found in three Court of Federal Claims opinions. <u>See</u> <u>Hometown Fin., Inc. v. United States</u>, 60 Fed. Cl. 513 (2004) ("<u>Hometown III</u>"); <u>Hometown Fin., Inc. v. United States</u>, 56 Fed. Cl. 477 (2003) ("<u>Hometown II</u>"); <u>Hometown Fin., Inc. v. United States</u>, 53 Fed. Cl. 326 (2002) ("<u>Hometown I</u>"). As set forth in more detail in <u>Hometown I</u>, the transaction at issue involved the voluntary supervisory conversion of Hometown Federal Savings and Loan into Hometown Federal Savings Bank. <u>See</u> 53 Fed. Cl. at 328-33. The conversion was based on two business plans, which generally called for the formation of a holding company and interim thrift, which would merge with the Savings and Loan to leave a single surviving institution controlled by the investors. <u>Id.</u> The plans contained a list of regulatory forbearances, which the investors requested from regulators before agreeing to provide the required capital. In particular, the investors sought to use the goodwill created by the conversion to meet regulatory capital requirements. <u>Id.</u>

The Federal Home Loan Bank Board ("FHLBB") approved the conversion on June 28, 1988. <u>See</u> FHLBB Resolution No. 88-513. Approval was made contingent on the execution by the holding company of a Regulatory Capital Maintenance Agreement ("RCMA") and the execution by the holding company's major shareholder (Continental Financial) of a Regulatory Capital Maintenance/Dividend Agreement ("RCMDA"). <u>Id.</u> The documents were executed, and the conversion completed.

The Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 ("FIRREA"), was passed on August 9, 1989. Consequently, as reflected in an Office of Thrift Supervision Report of Examination: "As a result of the new FIRREA legislation, all forbearances have been eliminated, and the Institution now fails all three capital requirements." See Hometown FSB OTS Report of Examination, January 16, 1990 (emphasis added). Thus, due to the passage of FIRREA, the Office of Thrift Supervision deemed Hometown Federal Savings Bank "insolvent." Id. When Hometown (the plaintiffs) refused to infuse more capital to meet the post-FIRREA capital requirements, Hometown Federal Savings Bank was placed in receivership. 53 Fed. Cl. at 331-32.

Hometown sued and, relevant to this appeal, asserted that by the passage of FIRREA, the elimination of forbearances, and the seizure of Hometown Federal Savings Bank, the government was liable for damages under a theory of breach of contract.

In Hometown I, addressing cross-motions for partial summary judgment on liability, the Court of Federal Claims held that a contract was formed between the plaintiffs and the government. Id. at 335-36. The court determined that the plaintiffs' fulfilled promise to infuse $2,050,000 into the converted institution was made in exchange for the forbearances and the treatment of goodwill offered by the FHLBB. Id. The court found that Hometown had not, like the plaintiffs in Guaranty Financial Services, Inc. v. Ryan, 928 F.2d 994 (11th Cir. 1991), contractually assumed the risk of the effect of regulatory change. 53 Fed. Cl. at 336-37. Rather, the court held that by contract the parties had for a five-year period reserved to the government the risk of regulatory change affecting goodwill and forbearances. Id. Observing that FIRREA

04-5116                                         3

was passed within the five-year period and "unquestionably took away those forbearances and the promised use of goodwill," the court concluded that the government had breached the agreement. Id. at 337.

In Hometown II, the Court of Federal Claims addressed the government's summary judgment motion with respect to Hometown's damages claims. The court denied the government's motion as it related to restitution damages, determining that restitution in the amount of $2,050,000 was appropriate because that amount reflected the benefit conferred by Hometown on the government. 56 Fed. Cl. at 484-85. The court granted the government's motion as it related to expectancy damages, or lost profits, because such damages arose from an injury to the corporation and not to the shareholders directly. Id. at 486-87.

After conducting a trial, the Court of Federal Claims held in Hometown III that Hometown had not materially breached its contract with the government, and accordingly, the government was not absolved from liability for its breach. 60 Fed. Cl. at 517-22.

The government appeals, and we review a decision of the Court of Federal Claims pursuant to 28 U.S.C. § 1295(a)(3) (2000).

II

We review the grant of summary judgment de novo, viewing all factual inferences in favor of the nonmovant. See Anderson v. United States, 344 F.3d 1343, 1349 (Fed. Cir. 2003). We otherwise review conclusions of law of the Court of Federal Claims de novo, while reviewing findings of fact made by the Court of Federal Claims for clear

error.  See Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1379 (Fed. Cir. 2001).

### III

The first issue we must decide is whether a contract came into existence between the government and the plaintiffs.  The existence of a contract is a mixed question of law and fact.  See Anderson, 344 F.3d at 1349.  To prove the existence of a contract with the government, a plaintiff must prove four basic elements:  (1) mutuality of intent to contract; (2) offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States.  See Cal. Fed. Bank, FSB v. United States, 245 F.3d 1342, 1346 (Fed. Cir. 2001).

In this case, the government challenges the findings of the Court of Federal Claims concerning elements (1) and (4).  In particular, the government contends that no contract was formed because government regulators had no authority to make a promise to Hometown concerning the treatment of goodwill, and, alternatively, because the parties did not have the shared intent to contract for the treatment of goodwill.  Hometown disagrees, asserting that authority existed for the government to make a promise concerning the treatment of goodwill, and that there is ample objective evidence that the parties did have a shared intent concerning the treatment of goodwill.  We discern no reversible error in the decision of the Court of Federal Claims, and therefore agree with Hometown.

### A

As we previously set forth in California Federal, government regulators, and in terms of this case, particularly the FHLBB and Federal Savings and Loan Insurance

Corporation ("FSLIC"), have authority to bargain for and enter into contracts in which the government promises the favorable regulatory treatment of goodwill in exchange for the assumption of the net liabilities of a failing thrift:

> We have already answered the question of whether the FHLBB and the FSLIC have the authority to enter into contracts like these in the affirmative. [Winstar Corp. v. United States, 64 F.3d 1531, 1548 (Fed. Cir. 1995) (Winstar II)]  Since its inception, the FSLIC has had the authority under 12 U.S.C. § 1725(c)(3) to make contracts. Id.  Further, both the FSLIC and its supervisory agency, the FHLBB, have had the authority both to extend assistance to acquirers of insolvent FSLIC-insured thrifts, 12 U.S.C. § 1729(f)(2)(A) (repealed), and to set minimum capital limits on a case-by-case basis, 12 U.S.C. § 1730(t)(2) (repealed).

Cal. Fed., 245 F.3d at 1347 (internal quotes omitted).

This holding was recently reaffirmed following a government challenge that it was erroneous in light of our decision in Schism v. United States, 316 F.3d 1259 (Fed. Cir. 2002) (en banc).  See Cal. Fed. Bank v. United States, 395 F.3d 1263, 1274-75 (Fed. Cir. 2005).  In reevaluating and rejecting for a second time the government's argument that the FHLBB did not have authority to enter contracts regarding treatment of goodwill that were binding on the government, we relied on the Supreme Court's analysis in Winstar, which, as set forth at 395 F.3d at 1274, states:

> There is no question . . . that the Bank Board and FSLIC had ample statutory authority to do what the Court of Federal Claims and the Federal Circuit found they did do, that is, promise to permit respondents to count supervisory goodwill and capital credits toward regulatory capital and to pay respondents' damages if that performance became impossible.

The remainder of our analysis of the Winstar opinion makes unequivocally clear that we are bound by the holding that the FHLBB had statutory authority to enter into contracts involving the treatment of regulatory capital and that Congress "specifically

acknowledged" the FHLBB's authority to permit thrifts to count goodwill toward capital requirements. Id. at 1274-75.

The government would distinguish the California Federal decisions from the case at bar because in its view, the authority for the contracts in California Federal flowed not from 12 U.S.C. § 1725(c), which, again according to the government, merely generally empowers the FHLBB to enter contracts, but from a more specific subsection of the statute, namely, 12 U.S.C. § 1729(f)(2). In the government's view, section 1725(c) is statutorily insufficient to support actual authority for an FHLBB promise of favorable accounting treatment of goodwill. This contention was disposed of in our recent decision in Home Savings of America, FSB v. United States, 399 F.3d 1341, 1356-57 (Fed. Cir. 2005). In Home Savings, as in California Federal, we analyzed the Supreme Court's Winstar opinion, holding that "the Supreme Court necessarily relied on the general grant of authority under [section] 1725(c)," and not the authority granted in section 1729(f)(2) "as authorization for two of the three transactions in Winstar." 399 F.3d at 1357. Thus, the authority of section 1725(c) is sufficient. In any event, because we are bound to follow our own precedent as set forth by prior panels, see Kimberly-Clark Corp. v. Fort Howard Paper Co., 772 F.2d 860, 863 (Fed. Cir. 1985); Mother's Restaurant, Inc. v. Mama's Pizza, Inc., 723 F.2d 1566, 1573 (Fed. Cir. 1983); accord South Corp. v. United States, 690 F.2d 1368 (Fed. Cir. 1982) (en banc), we reject the government's argument that the FHLBB had no authority to enter into a contract with the plaintiffs regarding the regulatory treatment of goodwill.

B

The government contends that even if authority to contract exists, the trial court erroneously concluded that the government intended a contract with terms addressing the treatment of goodwill. As postured, the government's argument appears more directed to interpretation than formation. However, to the extent the government is arguing a failure of formation due to a lack of objective evidence of the government's intent because "no promise regarding goodwill was ever made to [Plaintiffs]," we disagree.

Whether a bargained-for exchange occurred depends on the surrounding factual circumstances. See Cal. Fed., 245 F.3d at 1347. In this case, the government has shown no error in the holding of the Court of Federal Claims that the correspondence, memoranda, forbearance letters, and regulatory maintenance and dividend agreements gave rise to a contract which included provisions addressing goodwill. We note in particular four documents as evidence of the government's intent to contract for the treatment of goodwill, FHLBB Resolution No. 88-513, the RCMA, the RCMDA, and the forbearance letter of December 22, 1987.

FHLBB Resolution No. 88-513, dated June 28, 1988, makes approval conditional on, inter alia, the execution of the RCMA, and provides that "the Regulatory Capital Maintenance and Dividend Condition shall be deemed met if the Acquiror signs the attached [RCMDA]." (Jt. App. at 300662-63.) Both the RCMA and the RCMDA were executed on June 30, 1988, by the plaintiffs and the Supervisory Agent for the FSLIC. Both agreements extensively discuss the treatment of regulatory capital, and both agreements also contain the following language:

"Regulatory Capital Requirement" means the Institution's regulatory capital requirement at a given time computed in accordance with 12 C.F.R. § 561.13(b), or any successor regulation thereto, except that during the five-year period following consummation of the acquisition of the Institution, the Regulatory Capital Requirement of the Institution shall take into account forbearances granted by the FHLBB by letter dated December 22, 1987 and those granted by the Principal Supervisory Agent of the Federal Home Loan Bank of Indianapolis by letter dated April 1, 1988.

((Section I.E.) Jt. App. at A300665 and A3006671.) These sections of the agreements reference forbearances granted by an FHLBB "letter dated December 22, 1987." The December 22, 1987, letter "issued in connection" with the transaction, states that: "For purposes of reporting to the Bank Board, the value of any intangible asset resulting from the application of push-down accounting may be amortized by Hometown Federal over a period of 25 years by the straight-line method." (Jt. App. A300375-76.)

On balance, these documents, together with the other documents, facts, and circumstances relied on by the Court of Federal Claims separate this case from D&N Bank v. United States, 331 F.3d 1374 (Fed. Cir. 2003), on which the government heavily relies. In D&N Bank, we noted the complete absence of any documentary proof that the parties mutually intended to lock in by contract any provision for long-term amortization of goodwill. 331 F.3d at 1378-79. In this case, there is abundant documentary proof of mutual intent for such a contract provision.

IV

Even assuming a contract was formed, argues the government, the contract reflects that the parties intended to place the risk of regulatory change squarely on Hometown. This presents a question of contract interpretation, a question of law that

we review de novo. See Cienega Gardens v. United States, 194 F.3d 1231, 1239 (Fed. Cir. 1998).

In its Winstar opinion, the Supreme Court explained that in like contracts the parties had the power to promise to insure against the risk of loss associated with regulatory change. 518 U.S. at 869. In this regard, the Court noted with approval the example set in an Eleventh Circuit opinion on the issue:

> To be sure, each side could have eliminated any serious contest about the correctness of their interpretive positions by using clearer language. See, e.g., Guaranty Financial Services, Inc. v. Ryan, 928 F.2d 994, 999-1000 (C.A.11 1991) (finding, based on very different contract language, that the Government had expressly reserved the right to change the capital requirements without any responsibility to the acquiring thrift).

Id. at 869 n.15.

The similarity in contract language between the present case and Guaranty, as well as our opinion in Admiral Financial Corp. v. United States, 378 F.3d 1336 (Fed. Cir. 2004), underlie the government's contention that the parties shifted the risk of regulatory change to Hometown.

Like the present case, the transactions in both Admiral and Guaranty involved the rescue of failing thrifts with the infusion of capital from investors. Also like the present case, the transactions involved RCMDAs, see Admiral, 378 F.3d at 1338; Guaranty, 928 F.2d at 996. The agreements all contain a provision that states:

> All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquirors' obligation under this Agreement.

Admiral, 378 F.3d at 1339 (citing "clause VI(D)", "Miscellaneous Provisions"); Guaranty, 928 F.2d at 999 (citing "article VI(D)") (emphasis removed); (Jt. App. A300668; A300673 (clause V(D), "Miscellaneous Provisions")).

The agreements in Admiral, Guaranty, and the present case are not, however, identical. The Admiral agreement contained a section of "Definitions" containing a clause I.E., which states:

> 'Regulatory Capital Requirement' means the Institution's regulatory capital requirement at a given time computed in accordance with 12 C.F.R. § 563.13, or any successor regulation thereto.

See Admiral Fin. Corp. v. United States, Appeal No. 03-5168, at Jt. App. A400035, decided at Admiral, 378 F.3d 1336.

Article I(E) of the Guaranty RCMDA states as follows:

> 'Regulatory Capital Requirement' means the Institution's Regulatory capital requirement at a given time computed in accordance with 12 C.F.R. § 563.13(b), or any successor regulation thereto.*

See Guaranty, 928 F.2d at 999. As set forth in the Eleventh Circuit's opinion, the asterisk "directs the reader to a note . . . that reads, 'See Exhibit A, FHLBB forbearance letter, dated December 29, 1987.'"[1] Id.

As noted above, the RCMA and RCMDA of the present case also contain a "Definitions" section I.E., which states:

---

[1] The third forbearance set forth in the letter "concerns the treatment of supervisory goodwill." Id. It states:

> For purposes of reporting to the Board, the value of any intangible asset resulting from the application of push-down accounting in accounting for the purchase may be amortized . . . for a period not to exceed (25) years by the straight line method.

'Regulatory Capital Requirement' means the Institution's regulatory capital requirement at a given time computed in accordance with 12 C.F.R. § 561.13(b), or any successor regulation thereto, except that during the five-year period following consummation of the acquisition of the Institution, the Regulatory Capital Requirement of the Institution shall take into account forbearances granted by the FHLBB by letter dated December 22, 1987 and those granted by the Principal Supervisory Agent of the Federal Home Loan Bank of Indianapolis by letter dated April 1, 1988.

(Jt. App. at A300665 and A300671 (emphasis added).) The forbearance letter of December 22, 1987, contains five forbearances, at least two of which appear to be relevant here. The first forbearance states:

[T]he FSLIC will forbear, for a period of five years following consummation of the acquisition, from exercising its authority, under Section 563.13 of the Insurance Regulations for any failure of Hometown Federal to meet the net worth requirement of Section 563.13 arising solely from [inter alia, assets attributable to the Savings and Loan].

(Jt. App. at A300375.) The fifth forbearance is very similar to the third forbearance of Guaranty, see supra note 1. It states:

For purposes of reporting to the Bank Board, the value of any intangible asset resulting from the application of push-down accounting may be amortized . . . over a period of 25 years by the straight-line method.

(Jt. App. at A300376.)

As a matter of contract interpretation, we agree with the trial court that the "except that" clause, section I.E., "specifically identified how the forbearances should be treated." 53 Fed. Cl. at 337. In particular, section I.E. clearly sets forth the understanding of the parties that regulatory change was possible because it refers to calculating the requirement in accordance with "any successor regulation." This part of the definition places the risk of regulatory change on Hometown. However, what follows expressly excepts Hometown from that risk for a period of five years with the language:

"except that during the five-year period following consummation of the acquisition of the Institution, the Regulatory Capital Requirement of the Institution shall take into account forbearances granted by the FHLBB by letter." The agreement then expressly identifies the letters containing the relevant forbearances. As set forth above, one of the forbearances expressly addresses long-term amortization, and the other reflects the government's promise to forbear from enforcing the net worth requirements for "any failure" generally relating to the assets of the Savings and Loan. Thus, as the Court of Federal Claims correctly held, "the plaintiffs did not assume the risk of a regulatory capital requirement change during the five-year period in which the forbearances were in effect." 53 Fed. Cl. at 337. For that five-year period, Hometown was contractually entitled to use long-term amortization applying a 25-year straight line method, with the risk of regulatory change falling to the government. There is simply no other reasonable way to read this language, and indeed, the government points to none, arguing instead that Admiral and Guaranty require us to read the "except that" clause as either servient to the Miscellaneous Provisions, or out of the agreement altogether.

We disagree with the government's reading of Admiral and Guaranty. The court in Admiral was not faced with the "except that" clause present in the Hometown agreement. Rather, in Admiral, the court was faced with a contract that uniformly placed the risk of regulatory change on Admiral. 378 F.3d at 1339-43. Accordingly, the topography of Admiral is in sharp contrast to the case at bar. Thus, the discussion in Admiral on which the government relies, noting the Supreme Court's surprise at the lack of "clearer language" in the Winstar-type agreements, see 518 U.S. at 869 n.15, cannot be so rigidly superimposed on this case. It was not only necessary but easy for the

*Admiral* court to find the "risk-shifting language" of Miscellaneous Provision VI(D) clear and in alignment with the Supreme Court's note because there was no other contract language capable of limiting the effect or impact of that general provision. Having not considered the question, *Admiral* cannot make the specific "except that" clause servient to the general "risk-shifting" clause of the Miscellaneous Provisions.

In *Admiral* we stated that "we accord great weight" to the decision in *Guaranty*, 378 F.3d at 1340, and expressly considered the application of *Guaranty* in that case. Our view of the worth of *Guaranty* has not diminished. However, as with *Admiral*, we do not believe that the topography of *Guaranty* so aligns with that of the matter at hand that we should impose the result of *Guaranty* on this case.

*Guaranty* is a closer case. Although, like *Admiral*, *Guaranty* has no "except that" clause, the *Guaranty* court concluded that the footnote associated with the definition of Regulatory Capital Requirement "incorporated" the forbearance letter. As noted above, the forbearance in *Guaranty* pertaining to long-term amortization is similar in substance to the forbearance in Hometown's December 22, 1987, letter. In that case, Guaranty argued "that [the letter] confer[red] upon it an irrevocable right to treat supervisory goodwill as regulatory capital for twenty-five years." 928 F.2d at 999. In the context of that position, the Eleventh Circuit viewed Guaranty's forbearance letter as in conflict with the general contract provisions providing that regulations may be changed. Id. The *Guaranty* court applied the principle of contract interpretation that possibly conflicting contract provisions should be read harmoniously. Id. In so doing, the court interpreted the long-term amortization permitted in the forbearance letter as an

exception good for as long as the regulatory environment did not change, but servient to

the "risk-shifting" article. In the words of the Guaranty court:

> We interpret the forbearance provision to mean that the agencies would allow Guaranty to treat supervisory goodwill as regulatory capital so long as the regulatory [sic] remained as it was when the contract was signed. The agencies, in other words, granted Guaranty an exception to the rules of the game, and promised that the exception would be valid so long as the rules stayed the same. But the agencies, at the same time they made that promise, also unambiguously warned Guaranty that the rules might later change to Guaranty's detriment. By signing the contract, Guaranty took that chance, in effect wagering the chance that the rules would be changed against the potential return if they were not.

Id.

What distinguishes the present case is that there is language addressing the

length of time during which the promised exception would last. As set forth in the

RCMDA, the promises in the forbearance letter were to last five years. This stands in

contrast to the Guaranty contract, which has no language in the RCMDA establishing

the length of time for which the forbearances will apply to the Regulatory Capital

Requirement. In the present case, rather than unreservedly "wagering the chance that

the rules would be changed against the potential return if they were not," Hometown

limited its wager to a period of time starting five years after consummation of the

acquisition. It is no departure from Guaranty to recognize this distinction, and we do not

read the general "risk-shifting" provisions as unexcepted.

Neither Admiral nor Guaranty requires a holding that the parties in this case

shifted the risk of regulatory change to Hometown. We think harmony is found in

reading the Hometown agreement by understanding that the parties generally agreed

that the risk of regulatory change would be borne by Hometown but agreed to a specific

five-year exception. Our precedent establishes as a principle of contract interpretation

that a specific contract provision will control over a general contract provision. See Hol-Gar Mfg. v. United States, 351 F.2d 972, 980 (Ct. Cl. 1965). We find that principle appropriate here, and hold that Hometown did not assume the risk of regulatory change for the five-year period defined in section I.E.

V

The government finally argues that even if a contract was formed, and even if that contract assigned to the government the burden of the effect of regulatory change, the government cannot be held liable in this case as a consequence of Hometown's prior material breach. Whether a breach is material is a mixed question of law and fact. See Gilbert v. Dep't of Justice, 334 F.3d 1065, 1071-72 (Fed. Cir. 2003). The legal aspect of the question flows from the proper interpretation of the contract, while the factual aspects of the question flow from the parties' conduct—what they did, or did not, do. Id.

"A breach is material when it relates to a matter of vital importance, or goes to the essence of the contract." See Thomas v. Dep't of Hous. and Urban Dev., 124 F.3d 1439, 1442 (Fed. Cir. 1997) (citing 5 Arthur L. Corbin, Corbin on Contracts § 1104 (1964)). Under general contract principles, a party sued for breach of contract may defend on a theory that its nonperformance is excused because the other contracting party committed the first material breach. See Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1380-81 (Fed. Cir. 2004); see also Christopher Village, L.P. v. United States, 360 F.3d 1319, 1333-34 (Fed. Cir. 2004).

Notwithstanding the government's accurate assessment of the law, namely that there is a legal component to the question of whether a prior material breach occurred,

it is the facts of this case which dictate the outcome.  The trial court engaged in a detailed and thorough analysis of the facts, which after careful consideration are not shown to be clearly erroneous.  Accordingly, we affirm the trial court's judgment that there was no prior material breach.

## CONCLUSION

For the reasons stated above, the government's challenge to the final decision of the Court of Federal Claims fails.

## <u>AFFIRMED</u>